My name is Kevin Darkin. I represent the Relators. I'd like to reserve two minutes for rebuttals. Yes, you certainly may have that. However, would you mind waiting until your co-counsel actually sits down? I'm sorry. Okay, thank you. I apologize. I'd like to start very briefly with the retaliation claim, which is obviously important to Mr. Booker personally. There's two dates that are discussed in detail in the brief, September 10th, 2009 and September 16th, 2009. September 10th was a ride-along in which Mr. Booker rode with his supervisor, a man named Twidwell, to a doctor named Rao. And that's what I'm going to focus on. I'm not going to focus on the September 16th meeting. And there's basically four pages of the record that I'd ask you to focus on. And that is document 155-19 at pages 84 and 85, and then 247, 248. That's Mr. Booker's testimony about that ride-along. And the district court said... There's no corroborating testimony other than his own testimony on that, correct? That is correct, although at this point his testimony is to be credited for summary judgment purposes. But that is correct, Your Honor. Mr. Booker testified that Mr. Twidwell had coached him before they got to Dr. Rao's office to promote GEDON off-label for sleep improvement, cognition improvement, depression reduction, and reducing overt anger, all of which are off-label. Mr. Booker said he, quote, totally disagreed, unquote, with Mr. Twidwell, quote, really pushing me, unquote, to tell Dr. Rao that GEDON can improve sleep in patients, so he refused to comply. The result, according to Mr. Booker, was a, quote, huge blow-up about me not talking about sleep, unquote, and a big argument in the car, unquote, during which Twidwell, quote, intimidated me, unquote, and, quote, shut me down, unquote. According to Mr. Booker, Mr. Twidwell said, quote, it's going to be my way, unquote, and he, quote, got really upset with me. Counsel, there is a sort of predecessor issue, which is referred to in footnote 8 of your opponent's brief, as to whether this conduct, which is basically a fight about how they're going to market to a particular doctor, that at most might raise claims of off-label use, but have nothing to do with billing or the assertion of false claims to the government, and, indeed, your entire rest of the case about false claims to the government have to do with three uses that are not the uses that they had a fight about. So why is this within the rubric of protected conduct? Your Honor, here's my response. I compare the conduct that I just described with the conduct which district courts, admittedly district courts, not the First Circuit here in Massachusetts, in the Wilson v. Bristol-Myers Squibb. Yes, I understand there are some district court opinions, including one from some other state, but not within the First Circuit. But when you go back to the basic logic of the act, I am having some trouble seeing why, not at the motion to dismiss stage, but at the summary judgment stage, where there is no evidence of submission of false claims, or any sense that the conversation was about the submission of false claims. Why that meets your burden of showing that this is protected conduct? Your Honor, I would note the timing, which is this is September 10, 2009, nine days earlier, September 1, 2009, Pfizer announced a $2.3 billion settlement with the United States, which included $301 million for off-label marketing of this drug, Geodon. Okay, you still haven't answered my question. I've tried, Your Honor. Okay, you may have an uphill battle here. Is the idea that the fact of that settlement suggests that, is there any evidence that the parties to this conversation knew when they were having that conversation about that settlement? Everyone at Pfizer knew about that settlement, Your Honor. So is that the evidence on the record? I don't remember whether Mr. Twidwell was asked that. I know that I asked that of the Vice President of the Psychiatry Division. Wouldn't you need Twidwell to have known it? Or actually, more relevantly, Booker to have known it? Your Honor. Because I thought the implication that you were getting at was somehow, if there were surrounding evidence that when they're having a conversation, he's complaining about being pressured to market off-label uses, if in the background it's already known to him and it'd be evident that he, and I guess known to Twidwell too, that there was a specter of a false claim being brought based on this dispute about the off-label use, maybe that would suffice to give a basis for a jury to reasonably conclude that this was protected conduct. But what I'm struggling with is, in your brief, the only thing you've identified as a basis for concluding that is a conversation about off-label use. But, Carvel, it seems quite clear that just a conversation about or activity that relates to showing a regulatory violation is not protected conduct. It has to be the kind of activity that shows that you were interested in actually making an investigation into a false claim or was referencing a false claim. Nothing in your brief ties this conversation to anything relating specifically to a false claim. And let me add to that, let's assume there was a lot of information about the settlement. Your case seems to be that despite the settlement, this activity continued. Correct. One might draw the opposite conclusion that if there was a settlement, the government was satisfied that whatever was wrong had come to an end. What was wrong was supposed to have come to an end. Our allegations are that it did not, that it continued. I hear what you're saying, Judge Barron, about the Carvelis case. I did also note that in Carvelis, the court said that the plaintiff does not have to have developed a winning claim at the time of the alleged retaliation. Well, that's got to be true, but that's consistent with what Carvelis says in drawing that distinction. If they were having a long conversation about his investigation into false billing practices and he got fired for it, that would be retaliation, even if in the end he had no basis for bringing an allegation of a false claim. Because the thing that matters is the motive in firing the person to shut down enforcement of the FCA. And how can you conclude that we know that's what the motive in firing him was when all we know is they were having a conversation about off-label uses? The FCA doesn't prohibit off-label uses. It only prohibits false claims of off-label uses. And, in fact, in this case, some of the states specifically permitted the use of this drug and paid for it off-label. That's correct, Your Honor. We've acknowledged that. We don't dispute that. Our position on that is, as we say in the brief, is that Congress, in the Medicaid rebate statute, has defined covered off-patient drug to exclude drugs which are not approved, that are not on-label, and are non-compendium, like GEDON for kids. So it's our position that states are free to spend their money, their state share of Medicaid on GEDON for kids if they want to, but that Congress has not permitted that for federal share. But wouldn't you have to show some evidence that there was a false claim submitted to the federal government, and you haven't done that? Your Honor, all of these Medicaid claims are ultimately submitted to the federal government for payment of federal share. But you'd have to have some specific evidence of that, would you not? Well, so that's the actual claim issue, or aggregate data issue, which I'd like to turn to now. I looked at the Hutchison case that Judge Lynch wrote, and the Stahl case, which, I'm sorry, the Escobar case, which you wrote, Judge Stahl, the 400th Supreme Court. You did your homework good for you. And here's my argument. In the Hutchison case, this Court ultimately holds that falsity is not limited to failure to comply with a statutory or regulatory precondition, and so it can be determined circumstantially. In the Escobar case, when it gets to the Supreme Court, the Supreme Court similarly holds that materiality can be proven circumstantially. And then back to the Hutchison case, the Court noted that the word causes, or causation, in False Claims Act cases, is bound by tort law causation, which includes circumstantial evidence. And then in the Narat and Hardin case that Judge Lynch wrote, the Court held that causation doesn't have to be proven through testimony of individual doctors, in part because that's inaccurate, and instead it can be proven through a combination of aggregate evidence and circumstantial evidence. So my argument here is, if falsity can be proven circumstantially for False Claims Act purposes, materiality can be proven circumstantially, and causation can be proven circumstantially, why can't this actual claims requirement also be proven circumstantially? In the Hutchison case, the First Circuit said that looking at the falsity issue, the actual, or I'm sorry, the condition of payment issue was not in the text of the False Claims Act. Similarly, this actual claims issue is not in the text of the False Claims Act. Isn't that all follow, at least as our case has suggested, follows out of Rule 9, which is that in order to enable the defendant to evaluate the causation claims that are being proved circumstantially and all the other things that are being proved circumstantially, including materiality, it would be helpful to know what claim the plaintiff has in mind. So it's not so much that the specific claim can't be proven circumstantially, but it's got to be proven circumstantially with enough specificity that the defendant would know what claim is being talked about. The cases that FISA relies on and the District Court relies on were all non-off-label promotion cases. And here we have a situation where to prove a specific claim, we have to put specific doctors on. But we've held that you have to prove specific claims in off-label cases, haven't we? Not to my knowledge, Your Honor. I thought that wasn't Duxbury in part an off-label case? I don't believe that it held what you just said. Okay, well, it held something. And it didn't seem all that helpful to what you're arguing. Your Honor, to be honest, I'm not prepared to discuss Duxbury, so I just can't. I'm sorry. The only point I'm trying to make before I finish wrapping up here, before I come back, is this is not a case, the cases that FISA relies on, no one knows whether any actual claims were submitted to federal health care programs or not. And so the person files a complaint, says here's a scheme, and there was some Medicare or Medicaid, and maybe there were some claims that went there, maybe not. We know here from our expert and from the data that we've produced that there were claims paid by Medicaid around the country for off-label uses of GEDON for kids. So it's not like we're guessing, maybe there's claims, maybe there isn't. We know there were claims. Thank you. I'll be back here. Ms. Meyer. Good morning, Your Honor. It's Kirsten Meyer for Pfizer. On the retaliation point, well, let me take a step back. This is a case, I think in response to what Judge Barron was just asking, that has gone nowhere but backward since the motion to dismiss was granted in part and denied in part. So the relator's theory of liability is that Pfizer promoted off-label, a nationwide scheme, but the record evidence Subsequent to the settlement. Subsequent to the settlement, but the record evidence is that subsequent to the settlement, Pfizer directed its sales force repeatedly that it should promote only on-label, that it should promote GEDON for adult use. The relator doesn't dispute this. What he says, and his theory here, is the contention that by going to doctors and saying that GEDON is approved for adult use, that implied it was approved for use in children. There is no human being who has corroborated that purely speculative and frankly counter to the English language expectation. No evidence of anybody doing that, in other words. There is evidence of the sales rep saying that this is approved for adult use. The written materials that they used said that. There is no evidence that anybody at all interpreted that message to be a statement that this product was nonetheless approved for use in children and should be used in children. Was there evidence of billing for children? No, there is no evidence of billing in this case at all. The aggregate data that Mr. Darkin ended with is tables that his experts talk about based on survey data. The survey questions that were asked, and this is in the record in our motions to strike, some of the expert testimony, our summary judgment discussion of Dr. Rosenthal's testimony. These surveys did not ask about one survey that they rely on, the NDTI, it does not ask about promotion. It just asked doctors to record if they had a patient visit, where they recommended Geodon and what use they recommended it for. But does the survey show that some of those patients were children? The survey shows that some of those recommendations were for use in children, but they do not ask whether a prescription was written, whether that child was a Medicaid recipient, what state that child was in. That goes to the specific claim point, but I thought you were at a threshold point, and I think what the force of their claim is, we have data that Geodon was being recommended by doctors for children. No, wasn't it that it was being used? Not necessarily. Is there the connection that it was actually recommended for use, or the doctors simply were using it? What is the testimony? The data, they have experts who say that if a doctor wrote, if a doctor said that he told a patient that he thinks Geodon should be used, and that patient was a child, that that gets you to false claims liability, even if that doctor doesn't say Pfizer ever promoted the product at all. I'm at a threshold question. They do have data or evidence that suggests doctors were prescribing Geodon to kids. It may be disputed or whatever, but there's evidence of that, right? We have moved to strike the admissibility of the expert evidence on that, but they cite to survey data that say surveyed anonymous doctors said they recommended Geodon for use in kids. And what I think they're saying is given that was still going on post-settlement, they think it would be a reasonable inference for a jury to deduce that Pfizer came up with it. I'm not saying this is true, but I take it this is the theory. Pfizer came up with a clever way of handling the post-settlement behavior by having everybody continue to talk about Geodon off-label. Everybody knows that that can still then be used for those things, and then lo and behold, people are still doing it for prescribing for kids. That's the case, right? Right, except there's no evidence that they came up with a clever way to talk about Geodon off-label. There's no evidence that there was a discussion of Geodon off-label for use in children at all. I acknowledge the one exception being their client, Mr. Booker, says that he went into doctors' offices despite being told by his company not to do this. He acknowledges he disregarded that instruction during the three months he was still employed during this time period and told doctors to use Geodon for children. There is no evidence that any of those doctors prescribed Geodon for children, either as a result of that conduct or at all, let alone that any claims from such hypothetical prescriptions were ever submitted to a Medicaid program. And to go back to your first point, the claim is that the marketing for adult use, because it did not explicitly say, and by that we do not mean children, amounted to marketing for child use. That's correct, and that's not an inference that anybody is entitled to take to a jury. I have an eight-year-old, and when he's done at the dentist, the dentist says, good job, you may select a prize from the red drawer. My eight-year-old goes to the red drawer to pick a prize. He doesn't misinterpret that or get confused about whether he should go to a white drawer or a yellow drawer. If you tell a doctor the product is approved for use in adults, that's all you've said. Every time a sales rep walks into a doctor's office for any drug and any doctor, that doctor treats patients, a lot of patients, who are sick with diseases and conditions that that drug doesn't treat. There is no authority anywhere that has ever suggested that that rep must disclaim the FDA approval status of every off-label use that a doctor could put a drug to. Likewise, there's no authority here that Pfizer did anything other than provide truthful, accurate, on-label information about its product. At least after the settlement. At least after the settlement, that's the only relevant time period here. But just so I understand what we are really being asked to decide, as much force as there may be to what you just said, is that actually a relevant ground for resolving the appeal, as opposed to particularly under Rule 9 because they didn't identify any particular claim? Do you see what I'm saying? I think there are a number of grounds on which both the district court ruled. Did the district court rule on the ground you're identifying? The district court did not rule on whether, did not grant a summary judgment on the ground that there was no off-label promotion. He expressed skepticism in his decision about whether they could get to a jury. But he didn't rule on that. But it would be an available alternate ground. He ruled on a number of grounds. But we'd only need to get to that if there was some particular reason why one of the other grounds he identified was weak. Absolutely. And they're not. They're very strong. With respect to the judge's office. I've been thinking as I've been listening to both sides here. Today, medicine is very specialized. And children are normally treated by pediatricians. Was there any attempt to break down the evidence as to who was treating these people? Yes. In this time period, the one relevant to this case, Pfizer went to great pains to promote only to psychiatrists who saw and prescribed antipsychotics to a sufficient number of adult patients to warrant it being commercially reasonable to promote to them. That's why they went to psychiatrists who they analyzed and established, prescribed and treated adults as well as children. They did not call on pediatricians. Now back to Judge Barrett's question. The first and strongest and easiest ground for affirming the summary judgment grant on the off-label promotion-based claims is that there is no evidence of false claims submitted to any state Medicaid program. And on that, the cases we cited are clear. There is no contrary circuit law. The first circuit case is unpublished and a little bit dated, but it is consistent with the more recent cases from other circuits. They did not involve off-label promotion, but there isn't a special rule for off-label promotion cases that says you don't have to prove the false claims. And I think Judge Woodlock highlighted the 9B jurisprudence here in this circuit. I am familiar with Duxbury. I've also been reading and enjoying, frankly, the Hagerty, Lawton, and D'Agostino decisions that this Court has issued over the last three months, which emphasize that it is not enough to plead a scheme even with particularity and statistical evidence suggesting that it is even likely that false claims were submitted. That's not enough to survive a motion to dismiss. You need to plead the connection between the scheme and the false claims, the causation piece of it. And these are pharma off-label and kickback cases very analogous to this. Here, the aggregate data we've already talked about does not suffice to replace claims. And let me be clear here. It's not as though there wasn't an opportunity to develop this evidence if it existed. And it's not as though, I mean, I would submit the reason why we don't see this issue recurring in cases is because in most off-label cases, by summary judgment, relators have adduced evidence or attempted to of promotional conduct by a pharmaceutical company to at least a group of specific doctors that they can then show on the record, wrote prescriptions for the product off-label and connect those prescriptions to claims submitted on a Medicaid program. And the final piece to that is to a Medicaid program that... If that's when the settlement occurs, when the government presumably has to find false claims also. I want to be cautious that we keep the civil settlement agreement in its appropriate place. This is a civil settlement agreement that resolved a number of issues involving a number of drugs from an earlier time period. It does not involve the conduct at issue in this case. We don't have any information about what the Medicaid programs during that time period had for purposes of coverage rules for GEDON for the off-label uses at issue during that time period. And one of the key ways in which an off-label promotion claim may run afoul of the False Claims Act is if it's submitted to a government program that in fact does not cover that use. Here it is undisputed in this time period that for the off-label use at issue, GEDON for use in children, we provided examples of Illinois and Florida that promulgated coverage rules that said, bring on your claims, we will pay them. I'm just on the point which having now sat on a bunch of these cases, what plaintiffs say in these cases is that the burden of being able to actually identify the specific claim has become impossible for them to ever meet because that kind of data is simply not the kind of data they're going to be able to deduce even when everybody knows statistically that such claims were being filed. And so they've said that this aspect of our jurisprudence has just gotten out of hand. And so when you say they had every opportunity, in a time sense they did, but they say there's just no way realistically that they can ever get their hands on that kind of particular data because of HIPAA and all kinds of other things. That may be an argument that might or might not carry some weight at a motion to dismiss, which is pre-discovery. Here these relators had a full year of discovery during which they could issue You're not answering the question. So you have six years, one year of discovery, but the information simply isn't out there in a way that the plaintiffs can get access to information about actual submission of false claims. Because of patient privacy and the like, there's just no way to ever quite nail down the thing, even though these cases are proceeding in which the statistical evidence indicates. Imagine a case in which you have very strong evidence of fraud, very strong evidence of all the aspects of it, and very strong evidence that the drug companies make an absolute mint off of what seemed to be billing of these illegal uses. But the plaintiff can't tie any particular claim to it. And they come and say, you know, the reason we can't is because there's just no way we're ever going to be able to do that. And that doesn't spur the aims of the act. Respectfully, Your Honor, I disagree that they can't do it at summary judgment. All they have to do is get a sales rep. They listed dozens on their initial disclosures to say, I promoted this in this way. And then a couple affidavits declarations from doctors saying, I wrote prescriptions. Claims data from the state. If they issued a third-party subpoena to the state of Massachusetts, they would get doctor-specific, indication-specific claims data back. If the claims data has the age of the patient for a use like this, it would be evident from the claims data. You could connect it to a doctor and they could prove it up. And they're not likely to do that? Not at all here. Prescribing off-label is 100% legal for a doctor to do. The only issue for pharmaceutical companies is whether they are allowed to promote it off-label. That's what the FDCA prohibits, you know, subject to potential First Amendment restrictions on such restrictions, which are not at issue at the moment in this case. The doctors are not doing something illegal for prescribing off-label. In your case, if they prescribed it for a child, they'd be in big trouble, wouldn't they? No. They're free in their medical judgment to do it. It's not illegal whatsoever. It may be that a particular insurance company doesn't cover that use. There is no record evidence here that the relevant payers did not cover that use. And so this is not conduct that the doctors would be in any trouble for engaging in. If I understand it correctly, a doctor who might have read some literature, which not necessarily from the company, might have decided that in this particular patient that was an appropriate use. Certainly. Or yes, there are a host of reasons why a doctor might have. But we don't even get to that point because Pfizer's conduct, there's no evidence that any doctor interpreted Pfizer to even be promoting off-label to the doctor in the first place. But I think what you're saying is not totally responsive to the concern I was raising. Because I think if I'm understanding it, what you're saying is doctors will be willing to admit those things that they're allowed to do. But of course, for the plaintiff to be able to make a good False Things Act, they have to be showing that there was a violation, right? And so the question is, in any case in which would they need the doctor to be giving the evidence of, would the doctor be willing to do it because won't the doctor be admitting something problematic in that case? I'm not sure the doctor needs to admit something problematic. The claims data, which we don't have in this case, shows that John Smith, 10-year-old patient of Dr. Jones, filled a prescription for Geodon and submitted it and got paid by Massachusetts Medicaid. The doctor wrote the prescription. It was for a 10-year-old and it was submitted to Medicaid and filled. They've connected dots that are simply not even remotely connected. There's no bar to them getting that information. There's no bar whatsoever to them getting that information. It's readily available from the state. There was a protective order in this case that allows the production of HIPAA information for purposes of this case. And the key is, the other piece to that is, did a sales rep promote off-label to that doctor? If all of those pieces were together, even if the doctor said that promotion didn't cause my prescription, we could be having a very different conversation potentially. But this case is missing all of that evidence. Thank you, Your Honor. Thank you. Briefly, Your Honors, the issue about the doctors is this. You've got to get the doctor to admit that the doctor's treatment decision was influenced by the promotion. It's not enough just to get the doctor to say, I wrote this script. She was just saying you could bypass the doctor entirely. You could just get the claims-level data, and then you get a sales rep saying, I spoke to that doctor for which you have claims-level data, and that might be enough to connect the dots. But you don't have either thing. We don't have either thing because it's not enough. Because to make that causation argument, you've got to link up. Well, if what you're saying you have is enough, presumably that other thing would be better. It would be better. So what she's suggesting is at least you should have to have that much. The problem is you go back to the Naran decision from this court, and you look at why did this court say in that case, which was not a false claims act case, it was a civil RICO case. That's right, it wasn't. And the questions were very different. I understand. But the explanation for why it's difficult, if not impossible, to get doctor-by-doctor testimony is the same. You have to get a doctor to admit, I wrote this off-label prescription to this kid because the Pfizer person promoted it to me. And that is very hard. And the one thing I want to remind the court, which is obvious, is that this is my case. And you're deciding my case. But if you require doctor-by-doctor testimony for off-label promotion cases, you're writing it for the Department of Justice, too. And so that's something to keep in mind, perhaps. As to the quality of the data that we relied on, that NDTI data, that's the same data that this court relied on in the Naran and Kaiser case. And there's a quote on page in my brief concerning that quality of that data. In terms of Judge Stahl's question about who was treating these people, Pfizer was paying .68 credit for each kid prescription. So in other words, there was a financial motivation that Pfizer paid its sales reps for each kid prescription of GLA. Post-settlement. And that evidence is in the record. Yes. Can you just, before you sit down and speak to the retaliation issue and the aspect of the argument from your opponent that he was going to be fired for reasons totally independent of the off-label use conversation because of poor performance? And in your brief, I just couldn't quite tell what you were saying. You said that he was not on a performance plan at the time of that conversation. But you don't say that Tidwell recommended he be put on a performance plan. As I understand it, the record shows only that after that conversation, is it Tidwell or Twidwell? Twidwell. Twidwell simply informed Sanderson that the performance was poor. And then Sanderson puts him on a performance plan without knowing why Twidwell told him. There's no evidence that Twidwell said, I just had this conversation about off-label use. Is that all correct, what I just said? It is correct that Twidwell sent an email to Sanderson after the ride-along with Dr. Rao. And it is correct that Sanderson then immediately wanted Booker to be placed on a final plan. They have a first-step plan. But Twidwell didn't say anything about, please put him on a final plan. He just said he's had poor performance, isn't that right? He did not say, please put him on a final plan. And he didn't say, I just had this conversation about off-label use with him either. He just said the day after, this guy's performance has been bad. And then Sanderson makes the decision to put him on the... He said he wanted to talk to Sanderson about his field ride with Booker from last Thursday. That's what he said. And then on the same day, Sanderson sent an email to Pfizer Human Resources saying, I recommend we move to a final plan immediately, which is not the Pfizer policy. They have a progressive disciplinary policy. So Sanderson is trying to jump over the interim plan. In fact, he was put on an interim plan, and he ultimately was fired. In terms of the initial question you had, what's my position? He was not on a performance plan in September of 2009. He had been on a performance plan in 2008. He had succeeded on that plan. He had come off that plan. He was a normal status employee in September of 2009. Then he has the September 10th conversation we talked about right along, September 14th. Tweedwell emails Sanderson. Then Sanderson emails Pfizer Human Resources, can we put him on the final plan right away? He's put on an interim plan, and then in December he's put on a final plan, and he's fired. There were three prior communications giving him on core evaluations when Tweedwell goes into the field with him. So the September 10th is not like Venus appearing. There is a long history here of difficulties with the performance as far as Tweedwell is concerned. Your Honor, I can't agree to that entirely. I can agree partially. He had a prior supervisor other than Tweedwell in 2008. He was put on a plan in 2008. He succeeded. Yeah, and then Tweedwell becomes in April 2009 his district manager. And Booker never receives a rating above development opportunity, and there is a record of Tweedwell's criticisms of his performance. Your Honor. So you will admit there is prior data which is critical of his performance before September 10th. And after 2008. I do admit that. My only statement in the brief was simply that Judge Woodlock didn't do the third step of the McDonnell Douglas analysis. I'm just asking if you were to reverse him to send it back to him, let him do his job, let him do the third step, you don't have to do it for him. That's all I'm saying.